[No. 3494.]

### Tom Venters *v.* The State.

1. INDICTMENT — PRACTICE — NOLLE PROSEQUI.— Appellant was convicted upon a second indictment, charging the same felonious homicide. He pleaded specially that, a year previous thereto, the case then pending against him upon the first indictment was called for trial, and the State applied for a continuance on account of absence of a witness, which application was refused, and thereupon the counsel for the State moved that a *nolle prosequi* of the case be entered, and the court, over defendant's objection, sustained the motion and dismissed the prosecution, but detained the appellant in custody until the State's counsel obtained the second indictment (on which this conviction was had); wherefore the special plea alleged that the defendant had been prejudiced in his legal rights, and had been deprived of his constitutional right to a speedy trial, and was not amenable to trial upon the second indictment. To this special plea the State filed exceptions which were sustained by the court below. *Held,* that the plea was one not authorized by law, and therefore the court below correctly sustained the exceptions to it. But note the animadversions of this court upon such practice, and the suggestion that the law furnishes a remedy for a defendant who is deprived of his rights by an abuse of such practice.

2. SAME.— A *nolle prosequi,* when entered to a good indictment, is a termination of that prosecution, and there is no legal authority to detain in custody the accused when no new proceedings have been instituted against him by complaint or otherwise. Articles 545 and 547 of the Code of Procedure do not apply in such a state of case.

3. MURDER — FACT CASE.— See evidence *held* sufficient to sustain a conviction for murder of the second degree.

APPEAL from the District Court of Liberty. Tried below before the Hon. Edwin Hobby.

The indictment in this case charged the appellant with the murder of Jack Venters, in Liberty county, Texas, on the 2d day of December, 1882. His trial resulted in his conviction of murder in the second degree, and his punishment was affixed at a term of ten years in the penitentiary.

Mattie Brown was the first witness for the State. She testified that the deceased, Jack Venters, was her first husband. The witness was acquainted with the defendant, who was a brother to the deceased. Jack Venters died from the effects of a gun-shot wound on or about the 1st day of December, 1882. He and witness were living at a place called Dency Woods, about twelve miles east of the town of Liberty, in Liberty county, Texas. The place was owned by Mr. Likens. Deceased left home after supper on the night of December 30, 1882, to go to the house of Mr. Likens, to make a settlement with him. The distance from the house of deceased to that of Mr. Likens was about four hundred yards. When the deceased had been gone a half or three quarters of an hour, the witness heard the report of a gun fired from a point in the direction of Mr. Likens's house. After that some men brought the deceased home. He was mortally wounded, having been shot in the breast; some one of the men said by his brother, the defendant. He was suffering greatly.

Over the objection of the defense, the witness was permitted to testify that, about three quarters of an hour after the shooting, she asked the deceased why the defendant had shot him, and that the deceased replied that he had had no difficulty with the defendant; that he, deceased, went to defendant's house, and asked defendant's wife Ida, "what G—d d—d lie she had told Mr. Likens on him;" that Ida denied that she had told Likens a lie on him; that he replied to Ida: "You told Mr. Likens that I had reported to him that you had been stealing provisions from his commissary and giving it away, and, if you told him that, you told a G—d d—d lie, and I will slap your d—d head off;" that about this time the defendant came into the house where he and Ida were, and asked him, deceased, what was the matter; that he turned to defendant and told him that it was none of his d—d business, and that defendant then asked him if it was right for him to come into his house and curse and abuse his wife in that manner; that he told defendant that he need not take it if he did not like it; that he then walked out of the room, leaving defendant and Ida in there; that defendant soon followed him out to where he was talking with some of the boys, and again asked him if he thought he had treated him, defendant, right

in coming to his house and cursing and abusing his wife. In reply, the deceased said that he told the defendant that he had nothing against him, and was done with it, and that he then left and went on to Mr. Likens's to get his settlement; that he shortly left Mr. Likens's house, and, as he was passing out of the gate, he saw the defendant run around the corner of the fence; that when defendant got near him he called out: "Is that you, Jack?" that he replied in the affirmative, whereupon defendant again asked him if he thought he did right in going to the house and cursing and abusing Ida; that he replied, telling defendant to go on off, as he had already said that he was done with the matter; that defendant replied: "You told me if I did not like it not to take it; now, G—d d—n you, take that;" whereupon he fired, shooting the deceased through the breast, and then ran off. The deceased was perfectly conscious, and seemed to know what he was saying when he made the statement recited by the witness. He realized that his wound was mortal, and declared repeatedly that it would prove fatal. The shooting of the deceased occurred on November 30, 1882, in Liberty county, Texas. He lived nine days after he was shot.

Cross-examined, the witness testified that the deceased made the statement narrated about three quarters of an hour after he was shot. Witness had but recently given birth to a child, and was not yet out of bed when the shooting occurred. Aunt Maria Dunlap was at witness's house on the night that the shooting occurred. Jerry Walker and Freeman Thomas were the men who brought the deceased home after he was shot, and both remained all night. All of the hands on the place came to witness's house the night that the deceased was shot. Witness did not know who of them were in the room when deceased made the statement as to who shot him. Deceased did not take to his bed immediately upon reaching home, but for an hour or two sat in a chair, in which he seemed to rest easier. Witness did not know whether any one present heard deceased's statement to her as to who shot him. She heard him make the same statement several times. He talked about it to himself a great deal, notwithstanding witness tried to divert his mind. Witness frequently told him that he would get well. He always said that he would not; that the ball was still in his body, and would kill him.

Freeman Thomas was the next witness for the State. He testified that, on the night deceased was shot, he, the witness, was standing in Mr. Likens's dining room, which is very near the defendant's house, and while there heard a row in the house of the defendant.

Going out from the dining room, witness passed the defendant's front door, and saw the deceased and some of the boys standing on defendant's gallery, and heard defendant say to the deceased: "Jack, do you think you have done right in coming to my house and cursing and abusing my wife as you have done?" Deceased replied, interrogatively: "Don't you like it, G—d d—n you?" Defendant answered: "You would not like me to go to your house and abuse your wife;" and deceased replied: "No, G—d d—n you, but I have got a wife, and you have not." Defendant then said: "I don't think you have treated me like a brother, Jack;" and deceased retorted: "If you don't like it, G—d d—n you, don't take it," and stepped off the gallery, but turned and said to defendant: "I am done with this, now."

Witness went back to his house and in a few minutes passed defendant's house again, on his way to have a settlement with Mr. Likens. As he passed he saw the defendant standing at his gate, about fifteen feet from Mr. Likens's house, with his left arm resting on the fence. The night was quite dark, but witness passed near enough to recognize defendant. As witness went into Mr. Likens's house, he met the deceased coming out. He heard the report of a gun when he had been some three or four minutes in Mr. Likens's house, and heard the deceased cry "murder!" Mr. Likens and witness went immediately to the front gate, near which they found the deceased lying on the ground, groaning and seemingly in great agony. Witness was the first to reach him. Jerry Walker reached the prostrate man very nearly at the same time, and aided witness in raising him from the ground. Mr. Likens asked deceased what was the matter with him, and deceased replied that defendant had shot him. Mr. Likens examined the person of the deceased, and found him shot through the breast. Jerry and witness took deceased home. He walked the whole of the distance, supported on either side by witness and Jerry, and occupying about thirty minutes in traversing the distance.

Cross-examined, the witness stated that the distance between defendant's gallery and his gate, where witness saw the defendant standing, as he, witness, passed, going to Mr. Likens's house, was some three or four feet. The distance between the gates of Mr. Likens and the defendant was some fifteen or twenty feet, and it was some thirty yards from Likens's front door to the point where witness found deceased lying in the road. The distance from Likens's front gate to defendant's side gate was some forty yards. Aunt Maria Dunlap and deceased's wife were the only persons pres-

ent when witness arrived at deceased's house with the deceased. Several parties accompanied witness and Jerry Walker when they took deceased home; among them were Sam Jones and George Venters. Witness remained all night with the deceased. Deceased appeared to suffer great agony and talked but little. Witness did not hear him say anything to his wife about the shooting. On the contrary, he seemed to object to his wife going about him,— he appeared to be angry with her. Witness was in the house all night, but at no time heard deceased tell his wife that defendant shot him; or that he had no difficulty with defendant, or that he had done nothing to defendant. Doctor Tucker reached the wounded man about 1 o'clock, A. M., and administered morphine. Jerry Walker also passed that night at the house of the deceased.

Maria Dunlap was the next witness for the State. She testified that she was at the house of the deceased on the night of the shooting, waiting on deceased's wife Mattie, who had been recently confined. The deceased left home after eating his supper to go to Mr. Likens's to make a settlement. About thirty minutes after he left the witness heard the report of a gun in the direction of Likens's house. Within a short time deceased was brought home, shot through the breast. He was brought home by Freeman Thomas and Jerry Walker, followed by others of the hands on the place. Walker and Thomas said that defendant had shot the deceased. Deceased was suffering greatly and would not lie down, but sat in his chair for two hours. His wife, after he had been in the house about an hour, asked him why the defendant shot him. Over the objection of the defendant the witness was permitted to repeat the statement of the deceased as to by whom, why and how he was shot, and she detailed this statement in substantially the same language as that used by the witness Mattie Brown, formerly Mrs. Jack Venters, the wife of the deceased. The deceased was conscious when he made the statement to his wife, and said repeatedly that the result of his wound would be his death.

Cross-examined, the witness said that Freeman Thomas was in the house when the deceased made the statement detailed to his wife, and at the time it was made was sitting in the corner near the fire-place. Deceased was then sitting in front of the fire, and witness was sitting off to one side of the deceased, between him and his wife, who was lying across the bed. Witness did not know whether or not Thomas was asleep at the time the statement was made. Witness made a point of not talking to young men, and Thomas was a young man. She did not talk to him. Witness

went to bed and to sleep before the doctor arrived, and did not know who came to the house after she went to sleep. Witness left the deceased's house after breakfast next morning, and did not go back until after the death of the deceased. Witness had told everybody who had ever talked to her about the killing, of the deceased's statement to his wife. She told Deputy Sheriff John Stebs. Messrs. Lea and Minter said nothing to witness as she came down stairs on the morning of this trial, except to ask if she had yet given her evidence. On her replying in the negative they told her to take the stand and be sworn. Mr. Lea was the district and Mr. Minter the county attorney. The State closed.

Ida Venters, the wife of the defendant, was the first witness examined in his behalf. During the year 1882 witness lived with her husband, the defendant, at Dency Woods on Mr. Likens's place. Just after dark on the night of November 30, 1882, the deceased came to the defendant's house and was invited in by the witness. In reply to this invitation the deceased said that he had come to see what the G—d d—d lies were that witness had been telling on him. Witness told him to stop; that she had told no lies on him. He replied that witness was a G—d d—d liar; that she had told Mr. Likens that he, deceased, had said that witness was taking Mr. Likens's provisions and giving them away to the hands. Witness replied that she had told Mr. Likens no such thing. He replied that the witness was a " G—d d—d lying heifer bitch," and struck the witness on the side of her head with his fist. Shortly after this the witness's husband, the defendant, came into the house, and asked what was the matter. Deceased replied that it was none of his G—d d—d business; that the witness, a G—d d—d b—h, had been telling lies on him, and that he had a G—d d—d good notion to stamp the life out of witness. Defendant then asked the deceased if he thought it right to come to his house and talk that way to his wife. Deceased replied: " If you don't like it, G—d d—n you, don't take it." Defendant then asked: " How would you like for me to go to your house and talk in that way to your wife?" Deceased replied: " G—d d—n you, if you were to go to my house and talk to my wife as I have talked to yours, I would kill you; I have got a wife; you have got a G—d d—d heifer b—h for a wife." Defendant then said the deceased had no right to talk in that manner, when deceased struck him and said " G—d d—n you, I will stamp you to death." He then left. Defendant then sat by the fire for several minutes, when he got up and said he would go and make his monthly settlement with Mr. Likens, and afterwards

would leave the neighborhood.   When defendant got off the gallery witness heard him say:  "Is that you, Jack?" to which the deceased replied:   "Yes, G—d d—n you, what do you want?"   Defendant then said:   "Jack, do you think you have treated me as a brother should treat a brother?"   Deceased replied:   "G—d d—n you, if you don't like what I have done, I will cut your G—d d—d throat." Witness then heard a noise as if some one was running, and then heard the report of a gun.   She then ran from the house to the gallery.   Ben Jones was there in the yard, near the gate.   Deceased was standing near the gate.   Jerry Walker and George Venters soon got to him, and presently Mr. Likens, with a light, and Freeman Thomas joined them.   Witness could not say which of the two parties last named got to the deceased first.   Witness heard Mr. Likens ask the deceased what was the matter with him, and he replied that the defendant had shot him.   Deceased was standing up when Jerry Walker reached him.   Deceased did not fall or lie down after he was shot.   The gate at which the deceased was shot was not more than one step distant from the gallery of witness's house. The distance between the kitchen and dining room of the witness's house was about two feet.   Both of these rooms, facing south, have doors which open to the gallery.   Mr. Likens examined the deceased's wounds, but witness did not.   Deceased seemed to be in great agony.   On the same evening and before the shooting the witness told her husband that deceased had said that he was coming to witness's house and slap witness's head off, and that, if defendant interfered, he, deceased, would get nigger meat or get killed himself.

Cross-examined, the witness said that the defendant did not own a pistol, and witness did not see him with one.   She did not see the defendant after the shooting, when she got to the gate.   There was room enough between the dining room and kitchen of witness's house to admit the passage of a man.   Deceased had not been gone from witness's house over ten minutes when the shot was fired.   He lived nine days.

Jerry Walker, the next witness for the defense, testified that he was going to Mr. Likens's house for his monthly settlement on the night that deceased was shot.   He heard the shot fired when he reached the corner of the defendant's yard fence.   It was fired at the defendant's side gate.   He then heard the deceased exclaim "Oh Lordy! Oh Lordy!" and immediately ran to him, finding some one, Freeman Thomas he thought, holding him.   Deceased was bent over and evidently was in great agony.   About this time Mr.

Likens arrived with a light. He asked deceased what was the matter, and deceased replied that the defendant had shot him. Mr. Likens then examined him and found him shot in the breast. Witness and Thomas, walking on either side, took the deceased to his home, about four hundred yards from where he was shot. They were thirty minutes getting him to the house. Deceased did not talk when he got to his house, but was in very great agony. Witness did not hear him tell his wife that Tom Venters shot him, and that he had no difficulty with Tom. Witness never at any time heard deceased say anything about the shooting, except when he told Mr. Likens that Tom shot him. Witness spent that night at deceased's house, leaving it but once, and then to catch a mule for one of the boys to ride in going after the doctor.

George Venters was the defendant's next witness. He testified that he was a brother to the defendant and the deceased. Witness was in the dining room in the defendant's house when the quarrel between the deceased and Ida, the wife of defendant, commenced. Witness walked from the dining room to the gallery, and heard deceased call Ida a " d—d bitch," and saw him shove or strike her in the face. Defendant entered the house about this time and asked the deceased what was the matter. Deceased replied: " She has been telling G—d d—d lies on me, and I intend to mash her G—d d—d mouth, and if you don't like it, I will knock you down and stamp you to death." Defendant then asked deceased if it was right for him to talk to his, defendant's, wife in that manner, and deceased asked him, in response, if he wanted to take it up; at the same time striking the defendant, knocking him out on the gallery. Defendant then said: " Jack, you have not treated me like a brother." Deceased replied: " I am now done with it," and stepped out into the yard. Defendant repeated that deceased had not treated him like a brother, and deceased said: " Come out here if you don't like it, and I will stamp the life out of you." He then passed out of the gate going towards Mr. Likens's house, and defendant sat down by his fire.

Defendant presently got up, saying that he would go and make his settlement with Mr. Likens, for whom he was working. Shortly after he passed out of the house, and when he reached the south gate, the witness heard him say: " I come to you, Jack, as a brother, and want to know if you think you have treated me right." Witness then heard deceased reply that he would knock the defendant down and stamp him to death, and at the same time he heard the report of a pistol. Witness ran immediately to the gate, and

saw Jerry Walker step up and take hold of the deceased. Witness went up to deceased, who was then groaning in great agony. Freeman and Mr. Likens then came up, and in answer to Mr. Likens's question, deceased said that the defendant had shot him. Witness did not see the defendant until next morning. Mr. Likens examined and found that deceased was shot through the breast. Thomas and Walker, accompanied by witness, took the deceased home. When deceased reached home he would not let Mattie, his wife, talk to him. He seemed to be angry with her. Witness remained at the deceased's house about an hour, but did not hear deceased tell his wife anything at all about the shooting. Having stayed at the house about an hour, witness went for Doctor Tucker, and was gone about an hour and a half; returned and stayed at deceased's house the balance of the night. Deceased told witness that he had brought his misfortune on himself; that defendant was not to be blamed for shooting him, and that he did not want the defendant hurt for it.

Cross-examined, the witness stated that Ben Jones went with him for the doctor, and that on his return he went, alone, direct to the house of the deceased, and did not go by defendant's house. He did not know where Ben Jones was during the first hour which succeeded their return from the doctor's. Ben appeared at the deceased's at the expiration of an hour, and remained the rest of the night.

Ben Jones was the next witness for the defense. He testified that he was on the gallery of the defendant's house and saw all of the difficulty from its inception upon the deceased's appearance and quarrel with Ida until its close with the shooting of the deceased. His narrative from the time that deceased appeared, until the defendant passed out of the house and met him near the gate just prior to the shooting, conforms, almost circumstantially, to the narratives of Ida and George Venters. He testified further that when defendant met deceased at the gate, after the difficulty in the house, and asked him as a brother if he had done right, the deceased replied: "I told you I was done with it; if you want to take it up, G—d d—n you, I will cut your G—d d—d throat," at the same time striking the defendant. Defendant retreated into his yard, followed by the deceased, who was making demonstrations as if to draw a knife or pistol from his pocket. At this moment of time the shot was fired. Witness and Jerry Walker were the first persons to reach the deceased after he was shot. Soon after that Freeman Thomas and Mr. Likens, with a light, came up. Deceased

did not fall when he was shot, but bent his body into a stooping position. Witness went with Thomas and Walker when they took the deceased home. They stopped several times on the way, and were from a quarter to a half hour traversing the distance. Witness went with George Venters after the doctor. Witness did not hear the deceased tell his wife or any other person that the defendant had shot him.

Cross-examined, the witness said that when the shot was fired he was standing out in the yard in front of defendant's house, near the corner of the gallery which was nearest the gate between defendant's and Mr. Likens's houses. The defendant was inside of the yard when the shot was fired. Witness did not know whether or not deceased got into that yard when he started at the defendant just before the shot was fired, but he had got around the corner of the house. Witness saw the flash of the pistol. It came from the corner of the house where the witness last saw the defendant. Witness saw the deceased stagger when the shot was fired, and heard him cry " murder," and ran out to him. Witness did not see the defendant have a pistol. The deceased's wife and Aunt Maria Dunlap were at the deceased's house when the party arrived with the deceased.

S. Likens testified, for the defense, that just prior to the shooting the deceased came to his house very angry and very much excited. He told witness that he had heard that Ida Venters, the wife of the defendant, had told witness that he, the deceased, had accused her of stealing provisions from the witness's commissary to supply other hands. Witness told him that Ida Venters had told him no such thing, and that he ought not to pay any attention to such reports. Witness attempted to pacify him, but he left witness's house in four or five minutes still very angry and excited, saying that he intended to leave the witness's place. He did not ask for a settlement. Within three or four minutes after the deceased left his house, the witness heard the report of a gun or pistol out at his side gate, which was in the direction of the defendant's house, and following that report he heard some one exclaim " Oh Lordy! Oh Lordy! " Freeman Thomas was in the house with witness when the shot was fired. Witness took up a lantern and with Thomas went out to where the deceased was. Witness got to the deceased before Thomas did, and found two men, one of whom was Jerry Walker, holding the deceased up on his feet. Witness asked deceased what was the matter, and he replied that the defendant had shot him. Witness examined and found a wound in the right breast. Thomas

and Walker took the deceased home. Witness did not see the defendant, but George Venters and Ben Jones were there and went with Thomas and Walker when they took deceased home.

When witness first saw the deceased after he was shot, he was within ten feet of the side gate of the defendant's yard, some fifteen or twenty feet from the witness's house. He was in the lane or alley formed by the side yard fences of the witness and the defendant. The direct route from the witness's house to that of the defendant would be through the front gates of each, which were about twenty yards apart. Deceased left witness's house through the front door a few minutes before the shooting occurred. The distance from the witness's front gate to the defendant's side gate, where witness saw deceased after he was shot, was about forty yards; and from this latter place to the house of the deceased the distance was about four hundred yards. The deceased was a man of great physical strength, and by all the hands was considered by far the strongest man on witness's place. He was greatly the physical superior of the defendant. Defendant had lived with witness since 1872, and has always borne the reputation of a good, law-abiding citizen, and this is the first trouble he ever had within the knowledge of the witness. Witness, who was the proprietor of a saw mill, was settling with his hands on the night of the shooting.

Harris testified, for the defense, that he saw the deceased on the evening of and before the shooting. He asked witness if he had heard the news. Witness asked, What news? He replied that Ida Venters, defendant's wife, had told Mr. Likens that he, the deceased, accused her of stealing provisions and giving them away; that he was going to defendant's house that night and beat h—l out of her, and cut defendant's G—d d—d throat if he took it up. Witness saw defendant later that evening, and told him of these threats.

Mary Jane Venters, the sister-in-law of the defendant and the deceased, testified, for the defense, that she had a conversation with the deceased on the day of and before the shooting, in the course of which he made about the same statement and threats as those which, according to Harris, he made to him; of which statement and threats witness apprised defendant's wife, some two hours before the shooting.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. The appellant was convicted of murder in the second degree for the killing of his brother Jack Venters, the jury assessing his punishment at ten years in the penitentiary.

The trial and conviction were had at the March term, 1885. At the March term, 1884, the cause was reached and called for trial, whereupon the district attorney announced not ready and filed his motion for a continuance. The court heard the motion and overruled the same, thus requiring the State to announce ready for trial. Thereupon the district attorney prepared his motion to dismiss or *nolle prosequi* the cause, and filed it. This motion, over the objection of the defendant, was sustained, the cause was dismissed and the defendant was retained in custody by order of the said court, until the district attorney could procure another indictment against him. The defendant was so held in custody, and the indictment upon which he was tried and convicted was presented.

When this cause was called for trial, the defendant entered his special plea in which he specially pleads this matter, and says that by reason thereof he should not be further prosecuted. To this plea the district attorney excepted or demurred, and the court sustained the exception or demurrer; to which action of the court the defendant excepted and reserved his bill of exceptions. When the case was dismissed and the defendant remanded to custody, the court granted him bail in the sum of $1,000.

It is insisted by counsel for appellant that his plea shows that he has been deprived of a constitutional right: that of a speedy trial. In the motion to *nolle prosequi*, the only ground relied upon by the district attorney is the fact of the absence of a material witness, necessary to a conviction. The district attorney's motion for a continuance based upon the absence of this witness had been overruled by the court. The question presented under the particular circumstances of this case is, does the entry of a *nolle prosequi* by the competent authority put an end to the case? And does it therefore operate as a bar to a subsequent indictment for the same offense?

Counsel for appellant contends that, as the district attorney's motion to continue the case was denied and overruled, the appellant had the right to demand a trial, and that the entry of a *nolle prosequi*, under such a state of case, had the effect to end the prosecution. There is great force in this proposition. The State attempted to continue. The court held that she had no good and valid grounds for a continuance, and overruled the application. Defendant demanded a trial. To this demand he was answered with a *nolle prosequi*, but still held in custody until another indictment could be

procured.    This being presented, the case was, by operation of law, continued to the next term of the court.    The legal effect of this whole matter was to give to the State a continuance of the cause, when by the law of the land she was not entitled to it.    Why overrule the State's direct application for a continuance, and grant it indirectly?

Again: suppose this course be repeated at each succeeding term of the court?    Why have laws prescribing the requisites of an application for a continuance when made by the State, if a *nolle prosequi* will effect the same object?

We have made these observations to show that such a procedure, if persisted in, would result in very great oppression to a party charged with an offense.    And if a case should arise in which it appeared that such a procedure was had for the purpose of depriving the citizen of "a speedy trial," we think that the proper relief would be found.

But, after a very careful examination of the authorities bearing upon this subject, we have not been able to find one which authorizes such a plea as the one interposed in this case.    (Whart. Cr. Pl. & Pr., 447; *U. S.* v. *Stowell,* 2 Curt. C. C., 170; *U. S.* v. *Shoemaker,* 2 McLean, 114; *Com.* v. *Wheeler,* 2 Mass., 172.)

After the *nolle prosequi,* there was no authority under our statute to hold the defendant in custody.    This was an end of the prosecution under that indictment, and there is no provision of the Code by virtue of which the defendant could be held in custody for the offense charged in that indictment.    It is true that articles 545 and 547 of the Code of Criminal Procedure furnish authority for holding the defendant in custody when a motion to set aside, or exception to an indictment, has been sustained.    But in this case there is no complaint made to the indictment, and hence these articles do not apply.    It is unnecessary for us to decide whether the court had the right to order the defendant into custody, or whether a complaint could legally have been made against the defendant for the same offense contained in the indictment *nolle prosequied,* and an examination had thereon, etc.    We simply mean to say that our Code furnishes no authority to hold the defendant in custody when a *nolle prosequi* is entered upon a good indictment.

But, returning to the question as to whether the defendant in this case was deprived of a speedy trial, we are of the opinion, viewed in the light of the authorities, that he was not.    Let us suppose that the court had sustained the application made by the district attorney for a continuance, and that said application was fatally defective.

A continuance under such circumstances would have had precisely the same effect upon the rights of the defendant to a speedy trial as the course actually pursued in this case. And a repetition by the court of granting a continuance upon such defective application might lead us to conclude that this course of procedure was solicited for the purpose of defeating the defendant's right to a speedy trial. In such a case we think that a remedy could be found by which he could be relieved from such oppression.

In the case in hand, we fail to find that it was the intention of the district attorney and the court below to deprive the defendant of his constitutional right to a speedy trial, and hence the court did not err in sustaining the exceptions of the district attorney to the special plea of the defendant.

Appellant assigns as error that he was not "arraigned as required by law." The record does not support this assignment, but shows a legal though not a formal arraignment. Also that the court erred in admitting the evidence of Mattie Brown and Maria Dunlap, because the statements of the deceased were not dying declarations, etc. We have no doubt but that his statements were properly admitted as dying declarations, if not as *res gestæ.*

5th. "The court should have charged the law applicable to a case of circumstantial evidence." This is not a case depending alone upon circumstantial evidence.

6th. "Because the court erred in failing in its charge to properly define express malice." Appellant was not convicted of murder in the first degree, but of the second degree, and hence a failure to properly define "express malice" could not have injured the defendant.

"8th. The court erred in failing to properly define manslaughter." This objection is not well taken, because the charge of the court upon this degree of homicide is, we think, unexceptionable.

We have very carefully examined this record, and must say that we think that the learned judge who tried this case gave the defendant a fair trial. The charge is full, just and liberal to the defendant, presenting the law fully and clearly to each and every phase of the case. In fact it is unobjectionable in any respect, so far as we can perceive.

We have carefully considered all of the assignments of error by the appellant, and are of the opinion that none are well taken. The judgment is therefore affirmed.

*Affirmed.*

[Opinion delivered May 9, 1885.]